# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| EFE ERCELIK,<br><br>       Petitioner,<br><br>  v.<br><br>PATRICIA HYDE, Acting Director of Boston Field Office, U.S. Immigration and Customs Enforcement; KRISTI NOEM, Secretary of the U.S. Department of Homeland Security; PAMELA BONDI, Attorney General of the United States; in their official capacities,<br><br>       Respondents. | Civil Action No. 1:25-cv-11007 |

## REPLY TO RESPONDENTS' OPPOSITION TO PETITION FOR HABEAS AND MOTION FOR TEMPORARY RESTRAINING ORDER

## INTRODUCTION

Petitioner, Mr. Ercelik, now submits this reply to Respondents' Opposition to Petitioner's Amended Habeas Petition and Motion for a Temporary Restraining Order (Doc. No. 13).

Respondents' assertions that this Court lacks jurisdiction to hear Mr. Ercelik's petition are in error; their dismissal of his Constitutional claims is without merit. Furthermore, Respondents' characterization at oral argument of the myriad temporary restraining orders being granted nationwide against DHS's unilateral revocation of noncitizen students' SEVIS records as irrelevant to Mr. Ercelik's case is inapt. While Mr. Ercelik's case is not factually identical to these cases, they all implicate extremely pertinent concerns regarding DHS's lawless actions against international students – and recognize the urgent need for relief preserving the *status quo ante litem* in the face of an agency bent on doing what it will, regardless of its lack of legal authority, and leaving students to suffer the irreparable consequences.

Mr. Ercelik respectfully requests this Court similarly protect him from Respondents' evident determination to prevent him from appearing for his hearing in the Eastern Hampshire District Court – a course of action as bereft of logic as it is contrary to law.

## STANDARD OF REVIEW

To obtain temporary injunctive relief, Mr. Ercelik must demonstrate that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of that relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Brox v. Hole*, 83 F.4th 87, 91 (1st Cir. 2023). Irreparable harm and likelihood of success are the factors that "weigh heaviest in the analysis." *Braintree Lab'ys, Inc. v. Citigroup Glob. Mkts. Inc.*, 622 F.3d 36, 41 (1st Cir. 2010). When the government is a party, the balance of equities and public interest merge. *Does 1-6 v. Mills*, 16 F.4th

1

20, 37 (1st Cir. 2021); *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

Federal district court, not immigration court, is the appropriate – and indeed the only – court where this dispute may be heard at this time. The federal courts, not immigration courts, are where disputes of federal constitutional issues are adjudicated. And it is Mr. Ercelik's federal constitutional rights that are at issue. Mr. Ercelik has been constructively placed into ICE custody. That constructive custody violates a panoply of constitutional rights: it violates his Sixth Amendment right to attend a hearing in a criminal matter; it violates his First Amendment right to political demonstration; and it violates his Fifth Amendment by using ICE detention and removal proceedings not for their intended purpose but rather to exact punishment and retribution.

This Court is the only court with jurisdiction to hear these constitutional questions. As detailed below, Mr. Ercelik is likely to succeed on the merits of his constitutional claims and will suffer irreparable harm if this TRO is not granted.

## I.    This Court has jurisdiction to entertain Mr. Ercelik's petition because he is in the constructive custody of the Respondents

Under 28 U.S.C. § 2241, this Court has jurisdiction to entertain Mr. Ercelik's habeas petition, and thus his related Motion for Temporary Restraining Order, if he is "in custody" of the Respondents. Respondents argue that Mr. Ercelik is not in Respondents' custody because he "is not subject to an immigration detainer," "is not subject to a final order of removal," "is not in custody at a state facility awaiting ICE detention," and "is not subject to monitoring or reporting requirements." Doc. No. 13. As Respondents indicate, "a[n] [immigration] detainer, together with a final order of removal, may suffice to place the alien in the legal custody of [ICE] even if the alien is physically detained somewhere else," *United States v. Female Juv., A.F.S.*, 377 F.3d 27,

35 (1st Cir. 2004); and a noncitizen can indeed satisfy the "in custody" requirement of Section 2241 if a final order of removal against the alien exists. *See Devitri v. Cronen*, 290 F. Supp. 3d 86, 90 (D. Mass. 2017).

These are not, however, exhaustive descriptions of every scenario in which an individual will be in custody. Indeed, the U.S. Supreme Court long ago made clear that "the use of habeas corpus has not been restricted to situations in which the applicant is in actual, physical custody." *Jones v. Cunningham*, 371 U.S. 236, 239 (1963). In *Hensley v. Municipal Court*, 411 U.S. 345 (1973), the Court held that a habeas petitioner released on his own recognizance pending execution of his sentence was in custody for purposes of Section 2241 because his release was subject to certain conditions. *See also Justices of Boston Municipal Court v. Lydon*, 466 U.S. 294, 301 (1984) (holding Massachusetts bail statute, under which petitioner was released on certain conditions subjected him to "restraints not shared by the public generally" and thus rendered him "in custody" for purposes of habeas statute). "To establish constructive custody, a petitioner must show that his movements are 'restrained by authority of the United States.'" *Portillo v. Bharara*, 527 Fed. Appx. 48, 50 (2d Cir. 2013) (quoting *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 213 (1953). The notion of custody in these cases, expanded beyond the traditional walls of a detention facility, underscore the principle that the "in custody" requirement for habeas corpus petitions should be liberally construed. *Maleng v. Cook*, 490 U.S. 488, 492 (1989); *see also Valdez v. Hulihan*, 640 F.Supp.2d 514, 515 (S.D.N.Y.2009). "The very nature of the writ demands that it be administered with the initiative and flexibility essential to insure that miscarriages of justice within its reach are surfaced and corrected." *Harris v.. Nelson*, 394 U.S. 286, 291 (1969).

Here, Mr. Ercelik's "movements are restrained by authority of the United States." *Portillo*, *supra*. He is effectively trapped in his home because ICE agents have represented that they have

an administrative warrant[1] to take him into their physical custody and that should he step outside

of his home they will do exactly that. He cannot go to the store to buy food. He cannot attend his

college classes in person. He cannot visit with friends or engage in any of the activities of daily

life that require physical movement from his home. And this is all because agents of the United

States government have declared their authority to control his physical movements. Thus, he is in

the constructive custody of Respondents, and Respondents should not be permitted to "suffocate

the writ in stifling formalisms ... or scholastic procedural requirements" by arguing that confining

Mr. Ercelik to his home, rather than to some other facility, is not custody.  *Hensley v. Mun. Court,*

*San Jose Milpitas Judicial Dist., Santa Clara Cnty., Cal.*, 411 U.S. 345, 350 (1973).


**II.    Mr. Ercelik is not contesting the revocation of his visas**

Respondents next argue that this Court has no jurisdiction to hear Mr. Ercelik's challenge

to the revocation of his visas. Contrary to Respondents' assertions, however, Mr. Ercelik is not

challenging the revocation of his visas.


**III.    8 U.S.C. § 1252(g) does not deprive this Court of jurisdiction to hear Mr. Ercelik's petition, because he is not in removal proceedings**

Respondents argue that this Court cannot hear Mr. Ercelik's petition because §1252(g)

strips courts of jurisdiction to hear "any cause or claim by or on behalf of an alien arising from the

decision or action by [ICE] to commence proceedings … against any alien under this chapter." 8

U.S.C. § 1252(g). Be that as it may, no proceedings against Mr. Ercelik have been commenced.

The plain text of § 1252(g) does not support a reading that Mr. Ercelik's constructive detention and

---

[1] As of the submission of this reply, no administrative warrant has been produced Petitioner, undersigned counsel, or to this Honorable Court.

resulting constitutional claims arise from the government's "decision or action" to "commence proceedings, adjudicate cases, or execute removal orders," when he is not in removal proceedings, does not have a "case" before Respondents, and has no removal order.

In *Reno v. American-Arab Anti-Discrimination Committee,* 525 U.S. 471 (1999) the Supreme Court instructed courts to read 1252(g) narrowly. The 7th Circuit later provided a helpful explanation: "Almost every alien who brings a claim to federal court does so because she is threatened with removal from the United States…as the INS would have it here, the alien not only would be barred from raising virtually all claims prior to removal proceedings (because of exhaustion requirements) but then 1252(g) would preclude jurisdiction of all claims brought after removal is threatened. Such a reading would be inconsistent with the narrow interpretation of 1252(g) that [Reno] commands. *Fornalik v. Perryman*, 223 F.3d 523, 531 (7th Cir. 2000).

In *Ozturk v. Trump*, -- F. Supp. 3d --, 2025 WL 1145250, at *12 (D. Vt. Apr. 18, 2025), the District of Vermont noted that the Second Circuit has held that "a suit brought against immigration authorities is not per se a challenge [barred by 1252(g)]; whether the district court has jurisdiction will turn on the substance of the relief that a plaintiff is seeking." In that case, the court found that the plaintiff's claims challenging her "apprehension, detention, and the termination of her SEVIS" did not "raise challenges to the removal process," so §1252 did not apply. *Id.* at 36. *See* Exh. 1 (Opinion and Order, Ozturk v. Trump, Case No. 2:25-cv-00374-WKS (April 18, 2025) (D. Vermont)). Mr. Ercelik's case is analogous. He is not raising a challenge to his removal process; he cannot, as he is not in removal proceedings. Respondents' claims they intend to place Mr. Ercelik in removal proceedings, when they have not yet done so, does not equate to Mr. Ercelik being in proceedings. This Court is not barred from hearing his petition under §1252(g).

5

**IV.    Nor does 8 U.S.C. 1226(e) bar this Court from hearing Mr. Ercelik's petition, because Mr. Ercelik is not challenging a discretionary judgement**

Respondents argue that this Court lacks jurisdiction to hear Mr. Ercelik's petition because 8 U.S.C. § 1226(e) blocks judicial review of ICE's discretionary judgments and decisions to arrest and detain aliens subject to 8 U.S.C. §1226. But §1226(e) does not preclude review here. That provision states that DHS's "discretionary judgment regarding the application of [Section 1226] shall not be subject to review." Here, Mr. Ercelik does not challenge a "discretionary judgment." Instead, he asserts that the government has no legal authority to detain him in retaliation for his protected speech, that his detention violates his due process rights because it serves no legitimate purpose, and that his detention violates his rights under the Sixth Amendment rights because once in ICE custody he will lose his ability to appear as ordered at his May 7, 2025 hearing in the Eastern Hampshire District Court.

The Supreme Court has held that "where a provision precluding review is claimed to bar habeas review, the Court requires a particularly clear statement that such is Congress' intent." *Demore v. Kim*, 538 U.S. 510, 511 (2003); *Id*. at 517. This mandate for statutory construction is so strict that it has been criticized for establishing a "magic words" requirement for Congress to preclude habeas review. *INS v. St. Cyr*, 533 U.S. 289, 327 (2001) (Scalia, J., dissenting). And the Supreme Court has stated that section 1226(e) "contains no explicit provision barring habeas review, and its clear text does not bar [a petitioner's] constitutional challenge to the legal authority for their detention." *Demore*, 538 U.S. at 517. *See also Hernandez-Lara v. Lyons*, 10 F.4th 19, 33 (1st Cir. 2021) (Section 1226(e) did not deprive the court or jurisdiction where petitioner challenged the extent of the government's detention authority); *Nielsen v. Preap*, 586 U.S. 392,

401 (2019) (affirming that Section 1226(e) does not bar challenges to "the extent of the statutory authority that the Government claims").

"In *Velasco Lopez v. Decker*, the Second Circuit squarely considered the availability of habeas review for the petitioner who was detained under § 1226(a). 978 F.3d 842 (2d Cir. 2020). The Circuit court reviewed a grant of habeas relief under 28 U.S.C. § 2241 and held that § 1226(e) does not limit habeas jurisdiction over constitutional claims or questions of law. Id. at 850. Further, habeas review in federal court can consider claims that the discretionary process itself was constitutionally flawed. Id. In sum, whether a habeas petitioner received due process is not a matter of discretion and is subject to judicial review. Id." *Ozturk*, -- F. Supp. 3d --, 2025 WL 1145250, at *31 – 32; Exh. 1.

As the court recognized in *Ozturk*, where a petitioner "has raised questions that are fairly characterized as constitutional claims or questions of law," while the government does have discretion in § 1226(a) detention, "that discretionary process may be unconstitutional if it allows for the deprivation of constitutional rights. For jurisdictional purposes … [i]t is enough to acknowledge that because [the petitioner] has appropriately raised constitutional claims for [the] Court to consider in habeas, the nature of those claims defeats any jurisdictional bar set forth in § 1226(e)." *Id.* at 32. This Court is not barred from hearing Mr. Ercelik's petition by this section.

## V.    Neither 8 U.S.C. § 1252(a)(5) nor § 1252(b)(9) bar this Court from hearing Mr. Ercelik's petition, because he is not in removal proceedings and there are no final orders of removal

Respondents argue that this Court is barred from hearing Mr. Ercelik's petition because there is "a single path for judicial review of orders of removal entered through the administrative

process: 'a petition for review filed with an appropriate court of appeals.' 8 U.S.C. § 1252(a)(5)."

Doc. No. 13. Mr. Ercelik, however, is not seeking review of a removal order; he cannot, as no

removal order has been entered.  He has not even been placed in removal proceedings , nor had a

Notice to Appear served upon him, despite undersigned counsel's statement at oral argument that

she is available for service if the government seeks to begin that process.  This section simply does

not apply to him.

  Similarly, 8 U.S.C. § 1252(b)(9) cannot bar review of Mr. Ercelik's petition, because that

section applies only after a final order of removal has been entered. The text of the statute makes

this perfectly clear. The title of 8 U.S.C. § 1252 is "Judicial review of orders of removal. 8 U.S.C.

§ 1252. The language of subsection (b) continues:

> "(b)    Requirements    for    *review    of    orders    of    removal*
> With respect to *review of an order of removal* under subsection (a)(1), the following
> requirements apply ….
>
>  (9) Judicial review of all questions of law and fact, including interpretation and
> application of constitutional and statutory provisions, arising from any action taken
> or proceeding brought to remove [a noncitizen] from the United States under this
> subchapter shall be available only in judicial review of a final order under this
> section. Except as otherwise provided in this section, no court shall have
> jurisdiction, by habeas corpus under section 2241 of title 28 or any other habeas
> corpus provision, by section 1361 or 1651 of such title, or by any other provision
> of law (statutory or nonstatutory), to review such an order or such questions of law
> or fact." 8 U.S.C. § 1252(b) (emphasis added).

The statutory language could not be clearer: this section applies to judicial review of orders

of removal. As recently noted in an opinion issued in *Khalil v. Joyce*, Case No. 2:25-cv-01963-

MEF-MAH (April 29, 2025) (D. N.J.), "[b]ottom line: Section 1252(b)'s heading ("Requirements

for review of orders of removal") shows that Section 1252(b)(9) kicks in after a final order has

been entered, not before." *See* Exh. 2 (Opinion, *Khalil v. Joyce*, Case No. 2:25-cv-01963-MEF-

MAH (April 29, 2025) (D. N.J.) at pg. 27). It therefore has no application to Mr. Ercelik's case, where no order has been entered – and, indeed, no removal proceedings have been initiated.

## VI.    Mr. Ercelik is not asking this Court to grant him Voluntary Departure

Respondents claim that Mr. Ercelik is asking this Court to grant him voluntary departure, a form of relief available to some noncitizens in the course of their removal proceedings. *See* 8 U.S.C. § 1229c. This is incorrect. Mr. Ercelik does not claim that this Court has the authority to direct an immigration judge to make any given decision within an individual's removal proceedings. Mr. Ercelik's description of the process of applying for voluntary departure, and his eligibility to request voluntary departure should he be placed in proceedings, was simply meant to underscore the absurdity of Respondents' intent to prevent Mr. Ercelik from departing the U.S. voluntarily and at his own expense, in order to arrest him and put him in removal proceedings – where he would be eligible to request voluntary departure, after being held for an undetermined length of time at taxpayer expense, and after burdening the already incredibly overtaxed immigration court docket.

That absurdity – Respondents' baffling insistence on making Mr. Ercelik's departure from the country as prolonged and as expensive for the American people as possible – reveals much. This drive to waste as much time and money as possible becomes less baffling when viewed from a different perspective: it is actually a desire to inflict as much punishment on Mr. Ercelik as possible, whatever the cost, in order to penalize him for his viewpoints and to discourage speech by others with those same views.

## VII.    Mr. Ercelik's Constitutional Claims

Mr. Ercelik's constitutional rights are being violated each and every moment that he remains in the constructive custody of ICE. None of the Respondents' arguments to the contrary have merit.

### A.      Mr. Ercelik's Rights Under the Sixth Amendment

ICE's constructive detention of Mr. Ercelik violates his rights under the Sixth Amendment by preventing him from attending a hearing in his criminal case, scheduled to be held at the Eastern Hampshire District Court on Tuesday, May 7, at which he has been ordered by that court to appear in person.  Unable to attend his hearing, Mr. Ercelik will be denied all of the rights afforded to him under the Sixth Amendment: his right to a speedy and public trial, to confront witnesses, to testify and participate in his own defense, and to legal counsel. The Supreme Court of the United States has determined that the right to effective assistance of counsel inherent in the Sixth Amendment also applies to the plea bargaining process. See, i.e. *Hill v. Lockhart,* 474 U.S. 52 (1985);  *Padilla v. Kentucky,* 559 U.S. 356 (2010); *Missouri v. Frye,* 566 U.S. 134 (2012); *Lafler v. Cooper,* 566 U.S. 156 (2012).

Mr. Ercelik has reached an agreement with the Commonwealth in that matter which is scheduled to be presented to the judge at that hearing date. He not only wishes to appear, to resolve the matter pending against him; he has been ordered to appear by a sitting judge in that district. If he is not permitted to appear, he will be deemed in default subject to a bench warrant and, not only he, but also the Commonwealth – a separate sovereign with its own police powers derived from the Tenth Amendment – will be deprived of resolution.

Respondents dispense with Mr. Ercelik's claim with the perfunctory statement: "As the First Circuit has explained, '[a]liens are not entitled to the protections of the Sixth Amendment in

10

removal proceedings.' *Ferreira v. Barr*, 939 F.3d 44, 46 n.1 (1st Cir. 2019). As such, Petitioner's claim raised concerning his desire to attend his criminal proceedings is not cognizable under the Sixth Amendment." Doc. No. 13 n.2. But Mr. Ercelik is not in removal proceedings and he is not attempting to assert Sixth Amendment rights in the as-yet nonexistent immigration matter. Rather, by constructively detaining him, ICE is violating his rights in his criminal case, where he certainly does enjoy Sixth Amendment protections. *See Padilla v. Kentuck*y, 559 U.S. 356 (2010).

Mr. Ercelik's fear that he will be prevented from attending his hearing, and therefore will be deprived of those rights, is not based on speculation. Respondents have demonstrated their lack of respect for noncitizens' Sixth Amendment rights, and a lack of respect for the criminal courts in which their matters are pending, by refusing to make detained individuals available for hearings (even for video hearings, at detention centers readily equipped with the necessary technology), *see Doe v. Department of Homeland Security,* No. 03:24-cv-00259 Doc. 77 (W. D. Penn. January 31, 2025) (order granting preliminary injunction in challenge to ICE's policy and practice of refusing to allow noncitizens detained at Moshannon Valley Processing Center with unresolved criminal charges in New Jersey's courts to virtually participate in their criminal legal proceedings); and by detaining defendants in the middle of their criminal trials and refusing to make them available for those proceedings.[2]

In their Opposition, Respondents describe the process by which they assert Mr. Ercelik could "seek" to attend his hearing from ICE custody, a process involving the clerk of the Commonwealth district court issuing a writ of habeas corpus to the Sheriff with custody of Mr.

---

[2] *"'Egregious conduct': Boston judge finds ICE agent in contempt of court after man detained mid-trial,"* Boston 25 News (April 1, 2025) available at
https://www.boston25news.com/news/local/egregious-conduct-boston-judge-finds-ice-agent-contempt-court-after-man-detained-mid-trial

Ercelik; having that Sheriff then request ICE's permission to transport Mr. Ercelik to his hearing; ICE deciding whether or not to grant that request; and then, perhaps, assuming ICE approves, the Sheriff transporting Mr. Ercelik to and from the court. Doc. 13. Nowhere do Respondents guarantee that Mr. Ercelik will ever be made available to appear or even that he would remain local to the region if detained. It is abundantly clear that so long as Mr. Ercelik is in the custody of Respondents, he will have no assurance that he will be able to attend his hearing.

This violates his rights under the Sixth Amendment. It is also, once again, an inexplicable insistence on the part of Respondents to ensure that a simple process — Mr. Ercelik being driven to court by his defense counsel to appear as ordered — be tortured into a bureaucratic maze sure to take much longer, cost much more, and place far more administrative burden on the criminal courts of this Commonwealth and its law enforcement officers. And once again, Respondents' behavior becomes much less confusing when viewed from the proper angle: it is fueled by a desire to inflict punishment on Mr. Ercelik, and nothing more. Although placing Mr. Ercelik, who remains in lawful immigration status at this time and who has never violated any immigration laws (Hearing Trans., April 29, 2025 at 29:16), in removal proceedings in the instant matter is unnecessary since he has offered to depart, even if he were placed in removal process, that procedure is not intended to be punitive. "In short, a deportation hearing is intended to provide a streamlined determination of eligibility to remain in this country, nothing more. The purpose of deportation is not to punish past transgressions but rather to put an end to a continuing violation of the immigration laws." *I.N.S. v. Lopez-Mendoza,* 468 U.S. 1032, 1039 (1984).

Detaining Mr. Ercelik would deprive both Mr. Ercelik of his rights under the Sixth Amendment to criminal process and the Commonwealth of its constitutional right under the Tenth

Amendment to enforce its own police powers – and for no benefit to Respondents, whose only legitimate goal in instituting removal proceedings (indeed, the only result any immigration court can grant) is Mr. Ercelik leaving the U.S., which he has offered to do. The fact that the federal government seeks to justify detaining Mr. Ercelik, rather than allowing him to leave the country on his own, because "actions have consequences" (Hearing Trans., April 29, 2025 at 4:11, 24:17), reveals that the federal Government is not content with the plea agreement – a term of probation on three misdemeanor offenses – reached by the state prosecutor and Mr. Ercelik. By seeking to punish him more harshly than the state authorities for these state crimes, Respondents are further interfering with Mr. Ercelik's Sixth Amendment right to resolve his case in state court.

B.    **Mr. Ercelik's rights under the First Amendment**

ICE's constructive detention of Mr. Ercelik violates his rights under the First Amendment – specifically, that Respondents' detention of Mr. Ercelik has been pursued in retaliation for his protected viewpoint speech. To state a First Amendment retaliation claim, a plaintiff must show that: '(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by [the 's] exercise of that right; and (3) the defendant's actions caused [the plaintiff] some injury.'" *Ragbir v. Homan*, 923 F.3d 53, 66 (2d Cir. 2019).

Mr. Ercelik's past speech, including the alleged altercation at the pro-Israel demonstration on November 3, 2023, implicates matters of prominent public concern which have garnered national attention.  Respondents have taken adverse actions against Mr. Ercelik that are motivated, at least in part, by his past and future exercise of First Amendment-protected speech, as demonstrated by the fact that they sought to arrest him only after his name was "submitted for deportation" by a politically-motivated organization on April 8, 2025 (Doc. 9-5)  – when his criminal charges had been pending for a year and a half. By revoking his visas the very next day,

on April 9, 2025 (Doc. No. 9-6), and threatening him with arrest and detention, Respondents threaten Mr. Ercelik with the ultimate punishment for speaking out and discourage Mr. Ercelik and chill others from speaking out in the future.

Respondents' claimed intention to initiate removal proceedings against Mr. Ercelik, rather than allowing him to go home on his own when his ticket is already purchased is punitive and retaliatory in nature, in response to his protected speech. Mr. Ercelik's proposed self-deportation – flying home immediately after his criminal hearing at his own expense – achieves the Respondents' goal in every way. Not only does it remove him from the United States; it also ensures he cannot return. As Mr. Ercelik's visas have been revoked, he can no longer use them to travel, meaning he would have to apply for a new visa in order to return to the U.S. At that point, the Department of State would be able to refuse to issue him a new visa, ensuring he could not travel to this country. Respondents' insistence on detaining him is retaliatory, and violates his First Amendment rights.

A recent order issued in *A.A.U.P. v. Rubio*, Case No. 1:25-cv-10685-WGY (D.Mass. April 29, 2025) provides helpful analysis:

> "It is well established that noncitizens have at least some First Amendment rights, *see Bridges v. Wixon*, 326 U.S. 135, 148 (1945), and political speech is "at the core of what the First Amendment is designed to protect," *Virginia v. Black*, 538 U.S. 343, 365 (2003). … Plaintiffs have at least plausibly alleged that noncitizens, including lawful permanent residents, are being targeted specifically for exercising their right to political speech. *See American-Arab Anti-Discrim. Comm. v. Reno*, 70 F.3d 1045, 1063-64 (9th Cir. 1995), *rev'd on other grounds*, 525 U.S. 471 ("The Supreme Court . . . has accorded to aliens living in the United States those protections of the Bill of Rights that are not, by the text of the Constitution, restricted to citizens*."); OPAWL – Building AAPI Feminist Leadership v. Yost,* 118 F. 4th 770, 776 (6th Cir. 2024) ("Lawful permanent residents have First Amendment rights. . . . [T]hey have developed sufficient connections with the United States to be considered part of the national community: They live and work here lawfully, and they can serve in the military."); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271

(1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."); *but see Price v. United States Immigr. & Naturalization Serv.*, 962 F.2d 836, 841-42 (9th Cir. 1991). The Plaintiffs have also clarified that they do not mean to bring a selective prosecution challenge, but rather contend 'that Defendants are deporting people on the basis of their viewpoints alone.'" *A.A.U.P. v. Rubio*, Case No. 1:25-cv-10685-WGY Doc. No. 73 at p. 56 (D.Mass. April 29, 2025).

That court "could not agree" that such behavior would be constitutional, citing *Abourezk v. Reagan,* 592 F. Supp. 880 (D.D.C. 1984) ("[Public Officials] may not, consistent with the First Amendment, deny [noncitizens] entry solely on account of the content of their speech."), *vacated on other grounds,* 785 F.2d 1043 (D.C. Cir. 1986). *Id.* at 56-57. *See* Exh. 3 (Memorandum and Order, *A.A.U.P. v. Rubio*, Case No. 1:25-cv-10685-WGY (D.Mass. April 29, 2025)).

Mr. Ercelik has been targeted solely on account of his speech. Respondents characterize Mr. Ercelik's actions at the November 3, 2023 demonstration underlying the criminal case as "violent," and claim that Mr. Ercelik's First Amendment claim fails because "[t]he First Amendment does not protect violence." *N A.A.C.P. v. Claiborne Hardware Co*., 458 U.S. 886, 916, 102 S. Ct. 3409, 3427, 73 L. Ed. 2d 1215 (1982). Even if some of Mr. Ercelik's conduct at that demonstration had been violent – facts which are in no way settled and have not been determined by any finder of fact – Mr. Ercelik certainly engaged in protected speech: raising his middle fingers, waving a Palestinian flag, and exchanging crude words with those in attendance, which conveyed his political viewpoint.  There is a legitimate basis to conclude that it is Mr. Ercelik's expression of his political views about the State of Israel's treatment of Palestinians, rather than any alleged unprotected physical action, that is the reason he has been targeted by Respondents. Moreover, to the extent that his actions rose to a level beyond those protected by the First Amendment, punishment for that behavior is not the purview of ICE. Respondents repeatedly asserted during oral argument that "actions have consequences," and Mr. Ercelik

agrees: that is why he is facing criminal charges for certain of his actions. It is the criminal court, not Respondents, who determine guilt or innocence. Only after Mr. Ercelik has been adjudicated in a criminal court—with all of the constitutional protections afforded to him during those proceedings—may ICE evaluate what immigration actions flow from those convictions.

Respondents did not seek to detain Mr. Ercelik when his charges were filed. They did not seek to detain Mr. Ercelik when he traveled, twice, with court permission, outside the U.S., and returned and presented himself at the border and was admitted by DHS despite those pending charges. *See* Exh. 4 (Mr. Ercelik's most recent I-94 record and travel history).   Rather, Respondents sought to detain Mr. Ercelik after Mr. Ercelik's name was evidently brought to their attention by Canary Mission (Doc. 9-5), an organization whose mission is to promote the deportation of pro-Palestinian student activists. That organization, which "keeps a blacklist" of individuals it accuses of having anti-Israel views, publishes dossiers "documenting the target's alleged offenses and their contact information, including direct links to their social media accounts that can facilitate targeted harassment campaigns. The only official way to get an entry deleted is to release a public apology with evidence of new pro-Israel beliefs; these testimonials are then posted on the 'ex-Canary' segment of the Mission's website." *See* Exh. 5 ("This pro-Israel group keeps a blacklist. Now it's taking credit for deportations." Vox.com, April 25, 2025). It has taken credit for high-profile detentions of pro-Palestinian activists. *Id*.

In its post on X – reposted by a similar organization, Betar – Canary Mission described Mr. Ercelik as "egregious" and a "bastard" in the "rotten state" of Massachusetts, and crowed that it had "submitted his name for deportation." Doc. No. 9-5. Nowhere in that post was there mention of any criminal activity, or any offense Mr. Ercelik had committed aside from being one of "so many of these bastards" in the country. *Id*. Not long after Betar's repost, Respondents were at Mr.

Ercelik's door. It was not any alleged violence committed by Mr. Ercelik that incited Respondents to detain him; Respondents had surely been aware of Mr. Ercelik's charges long before that. It was Mr. Ercelik's name being flagged by these organizations that prompted action.

As the immortal words of Justice Brandeis remind us, however:

"Those who won our independence believed that the final end of the state was to make men free to develop their faculties, and that in its government the deliberative forces should prevail over the arbitrary. They valued liberty both as an end and as a means. They believed liberty to the secret of happiness and courage to be the secret of liberty. They believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against the dissemination of noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government.[3] They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infraction; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; that the path of safety lies in the opportunity to discuss freely supposed grievances and proposed remedies; and that the fitting remedy for evil counsels is good ones. Believing in the power of reason as applied through public discussion, they eschewed silence coerced by law-the argument of force in its worst form. Recognizing the occasional tyrannies of governing majorities, they amended the Constitution so that free speech and assembly should be guaranteed."

*Whitney v. California*, 274 U.S. 357, 375–76 (1927) (Brandeis, J. concurring).

Simply because Mr. Ercelik may have engaged in some conduct that was not protected speech does not mean that he engaged in no protected speech – and it does not mean that he was not targeted specifically because of the viewpoints he expressed. The timing of Respondents' targeting of Mr. Ercelik, and DHS's pattern of behavior toward pro-Palestinian student activists, is evidence that his viewpoint is precisely the reason Respondents have detained him, and

precisely the reason they seek to force him to go through removal proceedings rather than simply allowing him to achieve all parties' goals by leaving under his own power on May 7.

### C.    Mr. Ercelik's rights under the Fifth Amendment

Mr. Ercelik is also suffering a violation of his rights under the Fifth Amendment, in that his constructive detention by Respondents' is unjustified; Respondents are using detention and removal proceedings—civil processes—for punishment and retribution, and not to advance the legitimate purposes of immigration detention. *See Zadvydas v. Davis*, 533 U.S. 678, 690 (2001) (recognizing that ensuring future appearances and preventing danger to community are two legitimate reasons for immigration detention). A year and a half after the incident for which he is charged occurred, during which time Mr. Ercelik has been out of custody, attending college full time, and even traveling from and back to the United States, there is no credible argument that Mr. Ercelik cannot be safely released from his constructive detention in order to attend his court hearing. Moreover, where Respondents' detention of him appears to be motivated by a desire to retaliate against him for his expressed political views and to punish him more severely than the state prosecutor deems appropriate, those are not legitimate purposes for that detention. At a time when the federal government is plainly utilizing detention of non-citizens, including students who oppose the policies and practices of the State of Israel, for political theater rather than for legitimate purposes,[3] this Court should not countenance that in the instant case. Doing so violates Mr. Ercelik's  Fifth Amendment right to due process. *Jackson v. Indiana*, 406 U.S. 715, 738 (1972)

---

[3] *See*, e.g., "Rubio defends detention of Tufts graduate student Rumeysa Ozturk," The Hill (March 27, 2025), available at https://thehill.com/homenews/education/5217879-rubio-defends-turkish-student-arrest/ (last accessed April 30, 2025).

("nature and duration" of civil confinement must "bear some reasonable relation to the purpose for which the individuals is committed").

Respondents' dismiss Mr. Ercelik's Fifth Amendment claim simply by asserting that this Court has no jurisdiction to hear that claim, because 8 U.S.C. § 1226(e) dictates the proper avenue for Mr. Ercelik to raise such a claim is through a bond hearing in removal proceedings. Mr. Ercelik has already explained why, in fact, that subsection does not bar this Court from hearing his petition. His claim stands. And his continued detention, which serves no purpose other than to terrorize Mr. Ercelik and expend public resources on monitoring an individual who is neither a flight risk nor a threat to public safety, highlights once again that Respondents' only possible motivation in continuing to detain Mr. Ercelik is to retaliate against him.

## VIII.    Relief has been granted in many cases nationwide implicating concerns similar to Mr. Ercelik's

In many cases in District Courts all over the United States, international students like Mr. Ercelik have sued to overturn DHS's unilateral termination of their SEVIS records. *See* Exh. 6 (Supplemental List of Authorities). Many of these plaintiffs, although evidently not all, have also had their student visas revoked. The Department of State has neglected to notify many individuals with revoked visas that the revocation has occurred – as in Mr. Ercelik's case — and it is therefore difficult to obtain a complete picture of visa revocation across this litigation. Like Mr. Ercelik, most of these plaintiffs explicitly state they do not challenge the revocation of their visas (which implies they have indeed been revoked). They have been consistently granted temporary relief in the form of the reinstatement of their SEVIS records – indeed, DHS now claims to have reinstated

all SEVIS records it unilaterally terminated.[4] DHS never had the legal authority to perform those unilateral terminations, but only after an overwhelming cascade of litigation did it cease that illegal practice – and only because of the temporary relief granted in those cases were more students not irreparably harmed by DHS's unlawful action.

And so, Respondents' characterization at oral argument of these myriad temporary restraining orders being granted nationwide against DHS's unilateral revocation of noncitizen students' SEVIS records as irrelevant to Mr. Ercelik's case is inapt. While Mr. Ercelik's case is not factually identical to these cases, they all implicate extremely pertinent concerns regarding DHS's lawless actions against international students – and recognize the urgent need for relief preserving the *status quo ante litem* in the face of an agency bent on doing what it will, regardless of its lack of legal authority, and leaving students to suffer irreparable consequences while the courts sort out the mess. Like the plaintiffs in these cases, Mr. Ercelik has been the victim of DHS's unlawful action – and, like those plaintiffs, he cannot afford to wait until DHS walks back its unlawful policy of targeting pro-Palestinian activists. It will be too late for him. He desperately needs the relief he is seeking to ensure he is not irreparably harmed.

## IX.    Mr. Ercelik has shown that he warrants a grant of the relief he requests

The actions Respondents have taken against Mr. Ercelik, which they claim are grounded in such clear and settled law, are in fact the subject of intense nationwide litigation in which new orders are coming down every day; new principles are being illuminated on an hourly basis. In the

---

[4] See "DHS reinstates foreign students after court losses pile up," The Washington Post (April 25, 2025), available at https://www.washingtonpost.com/education/2025/04/25/international-students-records-visa-trump-dhs-sevis/ (last accessed April 30, 2025).

SEVIS records/Student Visa cases, and in the cases of students being targeted for activism, Respondents' actions have been rapid, taken on a massive scale, and have been unprecedented, causing serious widespread damage and requiring the courts to step in and ensure countless people are not irreparably harmed before the serious legal questions implicated can be settled. The principles at issue in Mr. Ercelik's case – whether an individual may be targeted for removal based on viewpoint speech, and whether an individual's status as a student can be endangered because of criminal charges that would not otherwise have any immigration consequences[5] – are being hashed out in real time.

Mr. Ercelik's claims are not, as Respondent deems them, specious. They are formed of the same subject matter right now constituting a storm of litigation from coast to coast. Things are not as settled as Respondents claim; in fact they are not settled at all. Mr. Ercelik has shown a likelihood of success on the merits of his petition sufficient to warrant the issuance of the temporary restraining order he has requested. He merits protection from Respondents' breakneck pace of lawless action – particularly considering the nonexistent harm Respondents would suffer if that relief should be granted. Mr. Ercelik has purchased a plane ticket that would, with the criminal court's permission, allow him to depart the country immediately after his hearing is concluded; undersigned counsel has offered to escort him to the airport and, as indicated at oral argument on April 29 (Hearing Trans., April 29, 2025 at 22:8 – 13) to purchase a ticket to be able to see him through the terminal and ensure he departs. Respondents had admitted that ICE could

---

[5] Simple assault and battery in violation of Massachusetts General Law c. 265 § 13A is not categorically a crime of violence and would not make Mr. Ercelik removeable under the INA. *See Johnson v. U.S.,* 130 S. Ct. 1265 (2010). Nor has he been convicted of any "crimes of violence for which a sentence of more than one year imprisonment may be imposed." 8 CFR 214.1(g) (setting forth regulatory grounds for condition of a student nonimmigrant's admission and continued stay in the United States).

do the same if they wished to be sure of his departure. Respondents have shown no harm, because they can show none; because the only interest they appear to have in Mr. Ercelik's detention is punish him and to retaliate against him. They argue that this Court has no ability to decide these constitutional matters; that because they have accused Mr. Ercelik of doing things that they do not like, they should be able to do what they want with him. That is not the way our constitution works.

Twice during oral argument before this Court on April 29, 2025, Respondents' counsel state: "actions have consequences." (Hearing Trans., April 29, 2025 at 4:11, 24:17.) But determining the consequences that Mr. Ercelik will face as a result of the actions alleged in his criminal matter is the province of the Eastern Hampshire District Court. Immigration detention and removal proceedings are not punitive. They are civil. Using them to punish – to impose consequences for someone's actions – is not permissible. And here, the only "actions" for which Respondents can mean to impose "consequences" is Mr. Ercelik's speech. The only grounds of removal to which he is subject at this point is based on his visa revocation. And as the Department of Homeland security recently indicated, "[p]rudential visa revocation, absent other factors, does not make an individual amendable to removal." See Exh. 7 (Declaration of Andre Watson, submitted in *Deore et al. v. Noem*, Case No. 2:25-cv-11038-SJM-DRG (April 1, 2025) (D. W. ich.) ¶ 21.)  Respondents may wish to place Mr. Ercelik in a detention facility and force him to wait to leave the country as a form of punishment for his alleged behavior. But that is not their right.

Respondents' actions in this case might seem baffling, but they are not without purpose. Their behavior is calculated – it is simply not calculated to achieve the legitimate goals the government traditionally pursues, like fairness and justice and efficiency. Only viewed through the lens of Respondents' true motivation – a desire to punish a college student who opposed the

22

actions of the State of Israel and to chill others from engaging in similar pro-Palestinian speech –

do their actions make sense. And that motivation is impermissible.

As recently noted in an order issued in *Mahdawi v. Trump*, Case No. 2:25-cv-00389-gwc

(April 30, 2025) (D. Vt.), "[i]f the Government detained [Petitioner] as punishment for his speech,

that purpose is not legitimate … Immigration detention cannot be motivated by a punitive purpose.

Nor can it be motivated by the desire to deter others from speaking." See Exh. 8 (Opinion and

Order on Motion for Release, *Mahdawi v. Trump*, Case No. 2:25-cv-00389-gwc (April 30, 2025)

(D. Vt.) at pg. 22).

## CONCLUSION

Accordingly, Mr. Ercelik respectfully requests that the Court grant the temporary

injunctive relief he has requested, enjoining Respondents from preventing him from attending his

hearing in his criminal matter in Eastern Hampshire District Court on May 7, 2025; and enjoining

Respondents from preventing him from immediately departing that hearing and proceeding

directly to Boston Logan International Airport to depart the United States, using a plane ticket he

has already purchased, at his own expense.

Respectfully submitted,

*/s/ Rachel M. Self*
Rachel M. Self
RACHEL M. SELF, P.C.
6 Beacon Street, Suite 825
Boston, MA 02108
(617) 742-0191 (Office)
(617) 742-0194 (Fax)
rms@attorneyself.com
BBO No. 660243

Dated: April 30, 2025

23