# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **EFE ERCELIK**,           )<br><br>      Petitioner,    )<br><br>      )<br><br>v.                )<br><br>**PATRICIA HYDE**, Acting Director of Boston  )<br>Field Office, U.S. Immigration and Customs  )<br>Enforcement; **KRISTI NOEM**, Secretary of the  )<br>U.S. Department of Homeland Security; **PAMELA** )<br>**BONDI**, Attorney General of the United States;  )<br>in their official capacities,      )<br><br>      Respondents.  )<br> | Civil Action No. 1:25-CV-11007-AK |

## MEMORANDUM AND ORDER ON PETITIONER'S MOTION FOR INJUNCTIVE RELIEF

**ANGEL KELLEY, D.J.**

On April 16, 2025, Petitioner Efe Ercelik ("Petitioner") filed a Petition for Writ of Habeas Corpus for relief under 28 U.S.C. § 2241 ("Section 2241") against Patricia Hyde, in her official capacity as Acting Director of the Boston Field Office for Immigration and Customs Enforcement ("ICE"); Kristi Noem, in her official capacity as Secretary of the Department of Homeland Security ("DHS"); and Pamela Bondi, in her official capacity as Attorney General of the United States (together, "Respondents"). [Dkt. 1]. Initially, Petitioner alleged that he was in Respondents' constructive custody, asserting that ICE agents were stationed outside his residence, poised to arrest him should he attempt to leave. [See Dkt. 1]. At that time, whether Petitioner was indeed in custody for purposes of a Section 2241 habeas petition was contested. [See Dkt. 7]. However, Petitioner was taken into actual custody of the Respondents, as he was

arrested by ICE agents at the Eastern Hampshire District Court after attending to his state court obligations.  [Dkt. 26].  The taking of Petitioner into physical custody resolved the dispute of whether constructive custody was sufficient to establish jurisdiction under Section 2241.

Currently before the Court is Petitioner's Motion for a Temporary Restraining Order ("Motion") [Dkt. 10] and Addendum [Dkt. 26] (collectively, the "Amended Motion"), requesting the Court to enjoin Respondents from further detaining him or interfering with his departure from the United States.  For the reasons below, the Court finds that Petitioner has met the criteria for injunctive relief, and the Amended Motion is **GRANTED IN PART** pending further proceedings.[1]  In summary, Respondents are **ORDERED** to **immediately release** Petitioner and are **RESTRAINED** from arresting or detaining him for civil immigration detention purposes during the pendency of these proceedings unless Respondents first provide advance notice to the Court and Petitioner's counsel, allowing Petitioner an opportunity to be heard.

## I.     BACKGROUND

Petitioner entered the United States in Spring 2022 on an F-1 student visa, which he has maintained through his full-time undergraduate enrollment.  In November 2023, Petitioner was involved in a verbal and physical altercation as a counter-protester during an on-campus political demonstration, resulting in several state criminal charges.  He was granted bail.

More than 17 months later, on April 16, 2025, ICE agents arrived at Petitioner's residence, informed him of his visa revocation, and attempted to arrest him.  At that time, Petitioner believed the agents were stationed outside his home, preventing him from leaving due

---

[1] The relief granted herein requires Respondents to release Petitioner from custody and refrain from detaining him during the pendency of these proceedings.  However, the Court does not opine on whether Petitioner may or may not depart the United States.  Petitioner's ability to leave the country remains a consequence of his own actions and is not explicitly authorized or prohibited by this Order.

to the imminent threat of arrest.  His defense counsel visited his residence, spoke with ICE agents, and was permitted to photograph a letter stating that the U.S. Department of State ("State Department") revoked his F-1 student and B-2 tourist visas on April 9, 2025.  [Dkt. 9-4].

That same day, Petitioner filed a habeas petition, alleging he was in Respondents' constructive custody and faced imminent arrest and detention, which would obstruct his ability to appear at his scheduled state criminal hearing.  He further argues that Respondents' detention efforts violate his rights under the First, Fifth, and Sixth Amendments, specifically that Respondents' actions constitute retaliation against his political speech and a misuse of immigration processes.  Further, he asserts that his detention lacks a legitimate purpose and unjustly impairs his ability to resolve pending state court charges.  On April 21, 2025, Respondents filed an opposition [Dkt. 7], contending that the Court lacks jurisdiction because Petitioner was not in their physical custody and, even if he were, judicial review of executive agency actions is precluded.

On April 23, 2025, Petitioner filed an Amended Petition for Writ of Habeas Corpus ("Petition") [Dkt. 9] under Section 2241, along with the instant Motion, continuing to seek relief from his constructive detention.  Respondents again opposed the requested relief [Dkt. 13], and the Court held a hearing on April 29, 2025, where the Court learned that formal removal proceedings had still not commenced through the issuance of a Notice to Appear ("NTA").  [Dkt. 12].  On May 5, 2025, the Court held a further conference, during which the parties reported no further updates on the initiation of immigration proceedings.  [Dkt. 20].

On May 7, 2025, while the Motion was still under advisement, Petitioner submitted an Addendum to his Motion, notifying the Court that Petitioner was arrested by Respondents' agents after he appeared in state court to resolve his criminal case.  [Dkt. 26].  Petitioner was

taken into their custody.  The Court ordered a hearing on the same date in light of Petitioner's

arrest.  [Dkt. 29].  Finally, the Petitioner was served with an NTA in court, thereby initiating the

removal process.  Petitioner reiterated that his detention serves no lawful purpose beyond

retaliatory punishment for his political speech and requests that the Court order his immediate

release.


## II.    JURISDICTION

Before addressing the merits of Petitioner's request for injunctive relief, the Court must

first establish its jurisdiction over this matter.  Federal courts are courts of limited jurisdiction,

possessing only the authority granted by the Constitution and statutes.  See Corrigan v. Bos.

Univ., 98 F.4th 346, 356 (1st Cir. 2024) (citing Kokkonen v. Guardian Life Ins. Co. of Am., 511

U.S. 375, 377 (1994)).  Nonetheless, "district courts retain jurisdiction over challenges to the

legality of detention in the immigration context."  Hamada v. Gillen, 616 F. Supp. 2d 177, 181

(D. Mass. 2009) (quoting Aguilar v. U.S. Immigr. & Customs Enf't Div. of Dep't of Homeland

Sec., 510 F.3d 1, 11 (1st Cir. 2007)).

Under Section 2241, federal courts may grant habeas corpus relief to individuals who are

"in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. §

2241(c)(3).  The highest duty of a court under our constitutional system is the careful

examination and adjudication of these habeas corpus petitions.  See Harris v. Nelson, 394 U.S.

286, 292 (1969); Burns v. Wilson, 346 U.S. 137, 148 (1953) (concurring statement of

Frankfurter, J.) ("The right to invoke habeas corpus to secure freedom is not to be confined by

any a priori or technical notions of 'jurisdiction.' . . . And so, *if imprisonment is the result of a*

*denial of due process, it may be challenged no matter under what authority of Government it was*

*brought about*." (emphasis added)).  Accordingly, the Court must determine: (1) whether Petitioner is in the custody of Respondents and (2) whether such custody violates constitutional or federal law.  Based on the record and the current procedural posture of this case, the Court finds that both conditions are met and retains jurisdiction over this matter.

### A.  Petitioner is in Custody

The first jurisdictional issue is whether Petitioner satisfies the "custody" requirement necessary for habeas review.  Section 2241's central requirement is custody; a concept courts consistently construe broadly.[2]  Indeed, case law confirms that habeas review even extends beyond mere physical incarceration, requiring instead that petitioners be subject to restraints "not shared by the public generally."  See Jones v. Cunningham, 371 U.S. 236, 240 (1963); Tinder v. Paula, 725 F.2d 801, 803 (1st Cir. 1984).

Initially, the issue of custody was contested.  Petitioner claimed constructive custody based on ICE agents' surveillance outside his residence, suggesting imminent arrest.  Courts have long recognized that custody is not limited to physical confinement but extends to situations where an individual's liberty is substantially restrained.  See Justs. of Bos. Mun. Ct. v. Lydon, 466 U.S. 294, 300 (1984) ("[T]he use of habeas corpus has not been restricted to situations in which the applicant is in actual, physical custody." (citation omitted)).  Habeas review has traditionally encompassed individuals subject to government supervision, even in the absence of formal incarceration.  See, e.g., Hensley v. Mun. Ct., 411 U.S. 345 (1973) (finding release on personal recognizance constitutes custody); Jones, 371 U.S. at 243 (holding that parole meets the

---

[2] See Maleng v. Cook, 490 U.S. 488, 492 (1989) (noting that the custody requirement has been "very liberally construed"); Harris, 394 U.S. at 291 ("The scope and flexibility of the writ—its capacity to reach all manner of illegal detention. . . have always been emphasized and jealously guarded by courts and lawmakers."); Peyton v. Rowe, 391 U.S. 54, 64 (1968) (holding the custody requirement "should be liberally construed" because of the remedial goals of the statute); Jones v. Cunningham, 371 U.S. 236, 243 (1963) (acknowledging habeas relief has never "been a static, narrow, formalistic remedy").

custody requirement); Lydon, 466 U.S. at 300-01 (finding pretrial release qualifies as custody); Lefkowitz v. Fair, 816 F.2d 17, 19 (1st Cir. 1987) (same). Petitioner's theory of constructive custody was a hurdle, one which the Court was uncertain could be established, but one Petitioner is no longer required to clear.

As of May 7, 2025, the question of custody is no longer theoretical. Petitioner was physically detained by ICE agents after attending a state court hearing. Unlike the prior claim of constructive custody, based primarily on his perceived restriction of movement due to ongoing surveillance, Petitioner is now undeniably subject to the executive's direct control. Given this development, the Court finds that the threshold jurisdictional requirement of custody is satisfied.

**B.  Applicability of Jurisdiction-Stripping Immigration Statutes**

Respondents advance several arguments to challenge this Court's authority to review the Petition. First, they contend that the plain text of 8 U.S.C. § 1201(i) bars district court review of the State Department's revocation of visas. Second, they invoke multiple jurisdiction-stripping statutes, arguing that: (1) Under 8 U.S.C. § 1252(g), district courts lack jurisdiction over ICE's decision to initiate removal proceedings and execute removal orders; (2) under 8 U.S.C. § 1226(e), judicial review of ICE's decision to arrest and detain Petitioner is foreclosed; and (3) under 8 U.S.C. §§ 1252(a) and 1252(b)(9), any future challenge to Petitioner's removal must proceed administratively before reaching a circuit court. Finally, Respondents argue that under 8 U.S.C. § 1252(a)(2)(B)(i), the Court lacks jurisdiction over decisions concerning Petitioner's voluntary departure from the United States. Petitioner refutes each argument and the Court examines them in turn.

**1.  Section 1201(i)**

On April 9, 2025, Petitioner's visa was revoked pursuant to Section 1201(i).

Respondents argue that the plain text of this statute categorically bars judicial review of such revocations. Section 1201(i) states:

> After the issuance of a visa or other documentation to any alien, the consular officer or the Secretary of State may at any time, in his discretion, revoke such visa or other documentation . . . There shall be no means of judicial review (including review pursuant to section 2241 of Title 28 or any other habeas corpus provision, and sections 1361 and 1651 of such title) of a revocation under this subsection, except in the context of a removal proceeding if such revocation provides the sole ground for removal under section 1227(a)(1)(B) of this title.

8 U.S.C. § 1201. Respondents urge this Court to follow courts in other jurisdictions that found "themselves without jurisdiction to consider the merits of a visa revocation upon operation of Section 1201(i)'s language." [Dkt. 13 at 9]. However, Petitioner does not contest the merits of the visa revocation. He has repeatedly and unequivocally stated that he is not challenging the revocation itself, but rather the subsequent detention and imminent arrest. [Dkt. 17 at 5]. Consequently, Respondents' reliance on Section 1201(i) is misplaced. The statute does not preclude judicial review of Petitioner's detention, which arises independently of the visa revocation. See Ozturk v. Trump, No. 25-CV-374, 2025 WL 1145250, at *12 (D. Vt. Apr. 18, 2025) (finding that Section 1201(i) does not bar judicial consideration of constitutional claims). The Court thus proceeds to Respondents' next argument.

### 2. Section 1252(g)

Respondents further argue that the Court lacks jurisdiction to review ICE's decision to commence removal proceedings and effectuate removal orders. Respondents direct the Court to Section 1252(g), which is titled "Judicial review of orders of removal." On its face, Section 1252(g) seems broad. It was, indeed, enacted to "to streamline removal proceedings and enhance enforcement of immigration laws that had gone largely unchanged since 1952." Patricia

Flynn & Judith Patterson, <u>Five Years Later: Fifth Circuit Case Law Developments Under the</u>
<u>Illegal Immigration Reform and Immigrant Responsibility Act</u>, 53 Baylor L. Rev. 557, 561
(2001). However, "the rest of the legislative history makes clear that the majority of members of
Congress did not intend for this provision to be infinitely broad." Matthew Miyamoto, <u>Whether</u>
<u>8 USC § 1252(g) Precludes the Exercise of Federal Jurisdiction over Claims Brought by</u>
<u>Wrongfully Removed Noncitizens</u>, 86 U. Chi. L. Rev. 1655, 1664 (2019). This is confirmed by
the statute's express words:

> Except as provided in this section and notwithstanding any other
> provision of law (statutory or nonstatutory), including section 2241
> of Title 28, or any other habeas corpus provision, and sections 1361
> and 1651 of such title, no court shall have jurisdiction to hear any
> cause or claim by or on behalf of any alien arising from the decision
> or action by the Attorney General to commence proceedings,
> adjudicate cases, or execute removal orders against any alien under
> this chapter.

8 U.S.C. § 1252(g). The plain text of the statute makes clear that Section 1252(g) applies to
cases when removal orders are entered against a noncitizen. <u>See</u> <u>Kong v. United States</u>, 62 F.4th
608, 612 (1st Cir. 2023). The question before the Court is whether it can also apply to cases
where an order of removal has not been entered. In fact, when the Court held its initial hearings,
Respondents had yet to initiate removal proceedings through the service of an NTA.

Respondents argue that Section 1252(g) also applies to "actions to commence
proceedings that ultimately may end in the execution of a final removal order," in addition to
applying to actions or decision to "adjudicate cases or execute removal orders." [Dkt. 13 at 11].
To bolster this argument, they point to several cases, almost all of which are out of circuit. The
Court appreciates the complexities of United States immigration law and recognizes that courts
often arrive at opposing conclusions when faced with jurisdiction-stripping statutes. <u>Compare</u>
<u>Taal v. Trump</u>, No. 25-CV-335-ECC-ML, 2025 WL 926207, at *2 (N.D.N.Y. Mar. 27, 2025)

(jurisdiction stripped), with Ozturk, 2025 WL 1145250, at *15 (jurisdiction not stripped).  This

Court is guided by binding precedent.[3]  It will turn to out of circuit case law when the First

Circuit and the Supreme Court are silent on an issue.  Here, the Supreme Court and the First

Circuit have neither been silent nor lacked clarity.

In Reno v. Am.-Arab Anti-Discrimination Comm., 525 U.S. 471 (1999), the Supreme

Court narrowly construed Section 1252(g), holding that it applies "only to three discrete actions

that the Attorney General may take: her 'decision or action' to '*commence* proceedings,

*adjudicate* cases, or *execute* removal orders.'"  Id. at 482 (emphasis in original).  Justice Alito

reaffirmed this limited scope twenty years later saying, "We did not interpret this language to

sweep in any claim that can technically be said to 'arise from' the three listed actions of the

Attorney General.  Instead, we read the language to refer to just those three specific actions

themselves."  Jennings v. Rodriguez, 583 U.S. 281, 294 (2018).  According to Reno and

Jennings, Section 1252(g) is not an automatic bar to judicial review.

Reading the statute narrowly, as the Supreme Court instructs, does not allow this Court to

expand Section 1252(g) to allow for "decisions and actions" that "ultimately may end in the

execution of a final removal order," as Respondents suggest.  [Dkt. 13 at 11].  Petitioner here

does not challenge the initiation of removal proceedings—rather, he challenges his detention,

arguing that it is retaliatory and serves no legitimate governmental purpose.  The First Circuit has

clarified that Section 1252(g) does not prevent judicial review of a petitioner's challenge to the

legality of their detention and noted that many decisions and actions within the deportation

process do not fall under the three specific exercises of discretion outlined in Section 1252(g).

See Kong, 62 F.4th at 617.  Similarly, district courts have recognized that habeas challenges to

---

[3] This Court also looks to our sister courts for persuasive authority.

discretionary detention—where a petitioner is not challenging the execution of a removal order—fall outside the scope of Section 1252(g). See Ozturk, 2025 WL 1145250, at *14 ("[T]he Court is not considering a removal case. The Court is considering a habeas challenge to discretionary detention."). Additionally, a sister court in this Circuit found that Section 1252(g) does not strip the court's jurisdiction when the alleged harm is purely motivated by the government's disagreement with certain speech. Am. Ass'n of Univ. Professors v. Rubio, No. 25-CV-10685-WGY, 2025 WL 1235084, at *12 (D. Mass. Apr. 29, 2025) ("AAUP"). That court reasoned that habeas claims implicating constitutional violations should not be shoehorned into Section 1252(g). Id.

Additionally, in dictum, the Reno court left open the possibility of an exception for outrageous conduct, stating there may be "a rare case in which the alleged basis of discrimination is so outrageous" that an exception might lie. 525 U.S. at 491. The Supreme Court did not discuss what constitutes an "outrageous claim," but the Second Circuit expounded on factors for courts to consider:

> [Reno] compels courts to evaluate the gravity of the constitutional right affected; the extent to which the plaintiff's conduct or status that forms the basis for the alleged discrimination is actually protected; the egregiousness of the Government's alleged conduct; and the plaintiff's interest in avoiding selective treatment, as balanced against the Government's discretionary prerogative.

Ragbir v. Homan, 923 F.3d 53, 69 (2d Cir. 2019), cert. granted, judgment vacated sub nom. Pham v. Ragbir, 141 S. Ct. 227, 208 L. Ed. 2d 1 (2020). However outrageous the claims might be is an inquiry that will not be addressed today. While Petitioner does not invoke this exception, the Court highlights it to underscore the conclusion the Supreme Court first arrived at in 1999: Section 1252(g) is not an automatic bar to judicial review. The Court thus rejects Respondents' argument and proceeds to the next theory.

### 3.   Section 1226(e)

Respondents contend that Section 1226(a) authorizes ICE to detain Petitioner and Section 1226(e) bars judicial review of ICE's decision to arrest and detain him.  Section 1226 governs apprehension and detention of noncitizens generally, while Section 1226(e) specifically limits judicial review.  It provides:

> The Attorney General's discretionary judgment regarding the application of this section shall not be subject to review. No court may set aside any action or decision by the Attorney General under this section regarding the detention of any alien or the revocation or denial of bond or parole.

8 U.S.C. § 1226(e).  The Court's analysis begins—and ends—with the Supreme Court's decision in Demore v. Kim, 538 U.S. 510 (2003).  There, the Court held that "where a provision precluding review is claimed to bar habeas review, the Court has required a particularly clear statement that such is Congress' intent."  Id. at 517 (citing Webster v. Doe, 486 U.S. 592, 603 (1988) ("[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear.")).

Petitioner has raised several constitutional challenges to his detention, and Section 1226(e) contains no clear statement barring habeas review of such claims.  The First Circuit agrees.  See Hernandez-Lara v. Lyons, 10 F.4th 19, 33-34 (1st Cir. 2021) (holding that Section 1226(e) does not strip jurisdiction over habeas petitions challenging constitutional violations related to detention); see also Pensamiento v. McDonald, 315 F. Supp. 3d 684, 689 (D. Mass. 2018); Ozturk v. Trump, No. 25-CV-10695-DJC, 2025 WL 1009445, at *4 (D. Mass. Apr. 4, 2025); Campbell v. Chadbourne, 505 F. Supp. 2d 191, 196 (D. Mass. 2007) (same).  Since binding precedent has already determined that Section 1226(e) does not bar habeas jurisdiction, the Court rejects Respondents' argument and proceeds to the next theory.

#### 4.  Sections 1252(a)(5) and 1252(b)(9)

Respondents argue that any future challenge to removal must proceed administratively before reaching a circuit court, relying on Sections 1252(a)(5) and 1252(b)(9).  The Court finds this misstates the law—neither provision categorically bars jurisdiction over Petitioner's habeas petition.

Sections 1252(a)(5) and 1252(b)(9) must be read in conjunction to determine their scope.  As statutory titles often provide context, see Singh v. Gonzales, 499 F.3d 969, 977 (9th Cir. 2007), the Court will examine the statutory text *and* the titles.  See also United States v. De La Cruz, 998 F.3d 508, 517 (1st Cir. 2021); Bollat Vasquez v. Wolf, 460 F. Supp. 3d 99 (D. Mass. 2020).  Section 1252(a)(5), titled "Exclusive means of review," provides that "a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of *an order of removal entered or issued* under any provision of this chapter."  (emphasis added).  Section 1252(b)(9), titled "Consolidation of questions for judicial review," provides that "judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review *of a final order under this section*." (emphasis added).

Section 1252(a)(5) grants exclusive review of orders of removal to circuit courts, while Section 1252(b)(9) (also described as a "zipper clause") consolidates judicial review of immigration proceedings into one action in the circuit court.  Reno, 525 U.S. at 483.  But critically, both provisions apply only to judicial review of removal orders.  See I.N.S. v. St. Cyr, 533 U.S. 289, 311 (2001); see also Jimenez v. Nielsen, 334 F. Supp. 3d 370, 381 (D. Mass.

2018).  The Court now turns to Respondents' arguments.

Respondents rely on <u>Aguilar</u> to argue that challenges to the removal process must go to circuit courts.  Specifically, Respondents point to the words "arising from" in Section 1252(b)(9), which, according to this Court's discussion above, invokes Section(a)(5).  [Dkt. 13 at 17].  However, they misstate <u>Aguilar</u>.  The First Circuit explicitly rejected an expansive reading of Section 1252(b)(9): The words "'arising from' cannot be read to swallow all claims that might somehow touch upon, or be traced to, the government's efforts to remove an alien."  <u>Aguilar</u>, 510 F.3d at 10.  Had Congress intended to broadly bar all related claims, it could have used the more expansive language, "related to."  <u>Id.</u>  It did not.  <u>See</u> <u>Coffey v. N.H. Jud. Ret. Plan</u>, 957 F.3d 45 (1st Cir. 2020) (applying the presumption that Congress gives effect to every word of a statute).  Applying canons of construction, the <u>Aguilar</u> court said Section 1252(b)(9)'s jurisdiction-stripping feature does not exclude claims that are independent of the removal process.  <u>Aguilar</u>, 510 F.3d at 11.  This includes "challenges to the legality of detention in the immigration context."  <u>Id.</u>; <u>see also</u> <u>Hernández v. Gonzales</u>, 424 F.3d 42 (1st Cir. 2005) (holding that claims about detention are independent of removal proceedings and, thus, not barred by section 1252(b)(9)).

This Court cannot endorse Respondents' interpretation that "removability issues related to the revocation of [Petitioner's] visa or regarding his requests for relief" must be presented at the administrative level.  [Dkt. 13 at 18].  Such an interpretation would improperly sweep in all claims remotely related to the removal process.  This is also not an interpretation endorsed by the First Circuit.  In fact, the very case that Respondents rely on stands for the opposite interpretation.

> We thus read the words 'arising from' in section 1252(b)(9) to
> exclude claims that are independent of, or wholly collateral to,

> the removal process. Among others, claims that cannot effectively be handled through the available administrative process fall within that purview. This reading, we believe, is consistent with the wise presumption that Congress legislates with knowledge of longstanding rules of statutory construction.

Aguilar, 510 F.3d at 11.  Thus, Aguilar and Hernández confirm that challenges to detention—independent of removal proceedings—are not barred by Sections 1252(a)(5) or 1252(b)(9).  This Court is dutybound to apply binding precedent.  And this we do.  For the foregoing reasons, the Court concludes that Sections 1252(a)(5) and 1252(b)(9) do not deprive it of jurisdiction to adjudicate Petitioner's claims.  Since there is no order of removal, the claims are independent from the removal process.

### 5.  Voluntary Departure

Finally, Respondents assert that the Court lacks authority over decisions concerning Petitioner's voluntary departure from the United States.  Petitioner refutes having ever raised such a claim.  Instead, he argues that the mention of voluntary departure was merely intended to highlight the absurdity of Respondents' insistence on detaining him despite his clear intent to leave of his own accord.  [See Dkt. 17 at 10] (arguing the mention of voluntary departure "was simply meant to underscore the absurdity of Respondents' intent to prevent [Petitioner] from departing the U.S. voluntarily and at his own expense, in order to arrest him and put him in removal proceedings").  Regardless, this argument has no bearing on the Court's jurisdiction over the Petition, which challenges his detention, not his ability to depart voluntarily.

Having established that jurisdiction is proper, the Court now turns to Petitioner's Motion.

### III.    STANDARD OF REVIEW

Rule 65 of the Federal Rules of Civil Procedure grants courts authority to issue temporary restraining orders and preliminary injunctions.  Courts apply the same standard in assessing a motion for temporary restraining order and a motion for preliminary injunction, which follow full briefing and the opportunity to be heard by the Court.  See Fed. R. Civ. P. 65; Wash. Tr. Advisors, Inc. v. Arnold, 646 F. Supp. 3d 210, 217 (D. Mass. 2022).  Following the briefing and oral argument in this matter, a preliminary injunction as opposed to a temporary restraining order, is appropriate.

A preliminary injunction is an extraordinary remedy, appropriate only under limited circumstances.  See Capen v. Campbell, No. 24-1061, 2025 WL 1135269, at *4 (1st Cir. Apr. 17, 2025) (citing Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 24 (2008)).  The primary function of a preliminary injunction is to maintain the status quo between the parties until the court can resolve the case on its merits.  Savino v. Souza, 459 F. Supp. 3d 317, 324 (D. Mass. 2020) (citing Benisek v. Lamone, 585 U.S. 155, 161 (2018)).  It serves as an equitable safeguard, preventing either party from taking actions that could alter their legal positions during the litigation and ensuring they remain, as much as possible, in the same circumstances as when the suit commenced.  Id. (citing Francisco Sanchez v. Esso Standard Oil Co., 572 F.3d 1, 15 (1st Cir. 2009)).

To secure injunctive relief, Petitioner must satisfy four criteria: (1) likelihood of success on the merits; (2) risk of irreparable harm without relief; (3) balance of equities favoring the petitioner; and (4) alignment with public interest.  Capen, No. 24-1061, 2025 WL 1135269, at *4 (quoting Corp. Techs., Inc. v. Harnett, 731 F.3d 6, 9 (1st Cir. 2013)).  Courts have emphasized that likelihood of success is weighed most heavily in this analysis.  Id. (citing Akebia

15

Therapeutics, Inc. v. Azar, 976 F.3d 86, 92 (1st Cir. 2020)).  Still, "the measure of irreparable harm is not a rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits," such that a greater likelihood of success on the merits permits "somewhat less" of a showing of irreparable harm.  Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009) (quoting EEOC v. Astra USA, Inc., 94 F.3d 738, 743 (1st Cir. 1996)).  Additionally, when the government is a party, the balance of equities merges with the public interest.  See D.V.D. v. U.S. Dep't of Homeland Sec., No. 25-CV-10676-BEM, 2025 WL 1142968, at *23 (D. Mass. Apr. 18, 2025) (citing Nken v. Holder, 556 U.S. 418, 435 (2009)).

## IV.    DISCUSSION

Petitioner satisfies the requirements for injunctive relief, as he has demonstrated that there are valid constitutional claims, and further established he is likely to succeed on the merits of these claims, faces imminent and irreparable harm, and the balance of the equities weigh in his favor.

### A.  Likelihood of Success on the Merits

As to the first and most important prong, Petitioner is likely to succeed on his claims that his detention violates his constitutional rights.

#### 1.  Facts Relevant to the Constitutional Claims

On November 3, 2023, Petitioner walked past and then approached a pro-Israel event at the University of Massachusetts Amherst, where he was previously enrolled.  Before engaging in a physical altercation with a pro-Israel protester, Petitioner waved a Palestinian flag, raised his middle fingers to pro-Israel protestors, and expressed his own pro-Palestine views using

sometimes crude language.  Following the above-mentioned physical altercation, a police officer arrived on the scene.  Three days later, Petitioner was charged for the altercation in East Hampshire District Court.  After it was determined that Petitioner was neither a flight risk nor a danger to the community, he was released on $250.00 bail.

Over the next 16 months, very little happened in connection to Petitioner's conduct on November 3.  Instead, he complied with all conditions of release and, with permission, traveled outside of the United States on two occasions, interacting with immigration officials upon reentry each time.  Petitioner has since pled guilty to misdemeanors,[4] with no required imprisonment, resolving the criminal matter in whole.

During this time, a profile for Petitioner appeared on the website for Canary Mission, an organization that claims its mission is to "document[] individuals and organizations that promote hatred of the USA, Israel and Jews on North American college campuses and beyond."  The profile of Petitioner discusses the events of November 3.  On April 8, 2025, Betar Worldwide, an organization that claims its mission is "to empower Jews to stand strong, speak out, and defend their heritage and Israel against all threats," tweeted an image from Petitioner's Canary Mission profile.  Along with the image, the tweet claimed to "have submitted [Petitioner's] name for deportation."  [Dkt. 9-5].   It appears that Petitioner's name had, in fact, recently been "submitted for deportation."  On April 9, 2025, just a day after the tweet, the Deputy Assistant Secretary of State for Visa Services sent a memo to ICE regarding revocation of Petitioner's visa, effective that same day.[5]  On April 10, 2025, the Department of Homeland Security issued an

---

[4] Both Petitioner and Respondents confirmed that the pled-to misdemeanors cannot serve as grounds for removability.

[5] The memo read: "On March 31, 2025, in response to a request from DHS/ICE and the assessment from DHS/ICE that Efe ERCELIK had been involved in antisemitic activities that 'involvement in antisemitic activities, his hateful rhetoric against Jewish students, and his violent attack of Jewish student on campus may indicate support for a

administrative warrant for Petitioner's arrest, claiming "the execution of a charging document to initiate removal proceedings against the subject" as a basis for the arrest.

On April 16, nearly a week after the issuance of the warrant, ICE agents arrived at Petitioner's home, demanding to arrest him.  [Dkt. 9 at ¶ 25].  When asked for the warrant, officers stated they did not have one.  Id.  Despite Petitioner remaining in lawful immigration status,[6] officers claimed Petitioner was now "illegal" in the country and, according to the Petition, "that if [Petitioner] declined to surrender himself to those officers' custody, regardless of their lack of a warrant, they would ensure that Petitioner will be charged with a federal hate crime and spend many years in federal prison."  Id. at ¶ 26.

It so followed that Petitioner filed a habeas petition and a request for a temporary restraining order, asking this Court to direct ICE to refrain from arresting or detaining him until he resolved his criminal matter, and then to allow Petitioner to depart from the United States to Turkey, his home country, on a flight for which he had already bought a ticket.  While Petitioner has made clear his intention to leave the country voluntarily (often referred to as self-deportation), his plan on its own is irrelevant to the Court's analysis.  Instead, the Respondents' actions to disrupt and delay his plan contrasts with the Trump Administration's stated policy initiatives.  This contrast offers additional evidence of the Respondents' improper motive to detain the Petitioner.

On May 5, 2025, the Government announced its intention to support those who planned to self-deport by providing financial and travel document assistance, including purchasing plane

---

designated terrorist organization and undermine U.S. foreign policy by creating a hostile environment for Jewish Students.' Including assault of a Jewish student on campus, the Bureau of Consular Affairs approved revocation on April 9, effective immediately."  [Dkt. 9-4].

[6] While revocation of his visa renders Petitioner deportable, he remained in lawful immigration status until his SEVIS profile was terminated.  Petitioner's SEVIS profile was not terminated until 2:07 P.M. on May 7, 2025, seemingly after ICE took him into custody.

tickets, a $1,000 stipend, deprioritization for detention and removal by ICE, and the ability to "leave safely, travel normally."  Homeland Sec., CBP Home: Assistance to Voluntarily Self Deport (May 5, 2025).  In the press release announcing the program, Respondent Noem stated, "If you are here illegally, self-deportation is the best, safest and most cost-effective way to leave the United States to avoid arrest . . . .This is the safest option for our law enforcement, aliens and is a 70% savings for US taxpayers."  Press Release, Dep't Homeland Sec., DHS Announces Historic Travel Assistance and Stipend for Voluntary Self-Deportation (May 5, 2025).  While it is unclear if Petitioner qualifies for the program, the preference for self-deportation is clear, preserving ICE's resources and saving money for the American taxpayer.

In his Amended Motion, Petitioner argues that there is "no basis for Petitioner's detention aside from Respondents' impermissible desire to inflict punishment on Petitioner for his political viewpoint."  [Dkt. 26 at 2].

## 2.  First Amendment

Petitioner alleges that his detention is motivated by retaliatory animus, targeting him for his political activism and speech.  The facts leading to Petitioner's arrest point to a likelihood of success on the merits of his First Amendment retaliation claim.

The Supreme Court has said that "it is a fundamental principle of the First Amendment that the government may not punish or suppress speech based on disapproval of the ideas or perspectives the speech conveys."  Matal v. Tam, 582 U.S. 218, 248 (2017) (Kennedy, J., concurring).  Importantly, "speech on public issues [(i.e., political speech)] occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."  Connick v. Myers, 461 U.S. 138, 145 (1983) (internal quotation marks omitted); see also Virginia v.

Black, 538 U.S. 343, 365 (2003). These protections have long extended to noncitizens residing within the country. See Bridges v. Wixon, 326 U.S. 135 (1945).

Here, Petitioner claims that ICE's detention is retaliation for his protected speech. For his First Amendment retaliation claim, Petitioner must prove: (1) he engaged in constitutionally protected conduct; (2) he was subjected to an adverse action by the defendant; and (3) the protected conduct was a substantial or motivating factor in the adverse action. D.B. ex rel. Elizabeth B. v. Esposito, 675 F.3d 26, 43 (1st Cir. 2012) (citing González-Droz v. González-Colón, 660 F.3d 1, 16 (1st Cir. 2011)); Gorelik v. Costin, 605 F.3d 118, 123 (1st Cir. 2010); Centro Medico del Turabo, Inc. v. Feliciano de Melecio, 406 F.3d 1, 10 (1st Cir. 2005).

As to the first element, Petitioner was likely engaged in protected speech. While, as Respondents argued, it is true that the Supreme Court has recognized specific categories of speech that are not protected, including true threats of, or actual, violence, Counterman v. Colorado, 600 U.S. 66, 72 (2023), the existence of acts that fall outside of the Amendment's core protections does not wipe away safeguards for protected speech—particularly political speech. Cf. Ashcroft v. Free Speech Coal., 535 U.S. 234, 255 (2002) ("The Government may not suppress lawful speech as the means to suppress unlawful speech."). Respondents argue that none of Petitioner's conduct is protected, as his alleged physical altercation with another protestor falls within an unprotected category; however, this fails to acknowledge Petitioner's other conduct, which certainly falls within the penumbras of protected speech.

This protected speech includes engaging in a counter protest, waving of a Palestinian flag, the showing of his middle fingers, and his political, albeit sometimes crude, speech, all in the name of advocating for the Palestinian people. See, e.g., Texas v. Johnson, 491 U.S. 397, 404-05 (1989) ("Especially pertinent to this case are our decisions recognizing the

communicative nature of conduct relating to flags.  Attaching a peace sign to the flag; refusing to salute the flag; and displaying a red flag, we have held, all may find shelter under the First Amendment." (citation omitted)); Cantrell v. Brunswick Me. Police, No. 23-CV-00283-NT, 2024 WL 1859800, at *7 (D. Me. Apr. 29, 2024) ("Any reasonable officer would know that a citizen who raises [his] middle finger—an all-too-familiar gesture—engages in speech protected by the First Amendment." (internal quotation marks omitted) (quoting Cruise-Gulyas v. Minard, 918 F.3d 494, 495, 497 (6th Cir. 2019))).  As a result, Petitioner was engaged in protected speech.

Turning to the second element, clearly Petitioner has been subjected to an adverse action by the Respondents, namely, his detention.

Finally, as to the third element, every fact points to Petitioner's protected conduct as the substantial or motivating factor for Respondents' pursuit of detention.  First, as Respondents admitted, there is no ground other than the Secretary of State's revocation of his visa that would render Petitioner deportable, and by extension, subject to ICE's detention.  As of May 7, 2025, Petitioner has pled guilty to misdemeanors and received a sentence of probation with no term of imprisonment.  This conviction does not make Petitioner deportable.  Further, the state prosecutor and judge involved in meting out Petitioner's punishment for his behavior on November 3 determined that imprisonment would be an inappropriate resolution to the criminal matter.

Second, the sequence of events, from Petitioner's conduct on November 3 to his criminal arrest, to his appearance on politically motivated websites, to the revocation of his visa, to his arrest by immigration officers, strongly support the inference that Petitioner's protected conduct was the motivating factor for his detention.  More specifically, Petitioner took part in a protest

and was then arrested for the altercation on November 3, 2023.  Petitioner was criminally charged on November 6 and released on $250.00 bail.  Petitioner remained free on bail until the resolution of his criminal matter on May 7.  ICE took no interest in Petitioner until March of 2025, a period of at least 16 months.  During that 16-month period, Petitioner complied with his conditions of release and even traveled out of the country on multiple occasions, interacting with immigration authorities at the airport.

Instead, Respondents' pursuit of detention seems to have been almost exclusively triggered by Betar Worldwide.  On April 8, 2025, Betar Worldwide tweeted the profile of Petitioner hosted on the website for Canary Mission.  Canary Mission and Betar Worldwide commonly identify pro-Palestinian students, professors, and professionals as targets for removal proceedings.  The tweet from Betar Worldwide read: "We identify Efe Ercelik as one here on a visa and we have submitted his name for deportation. There's so many of these bastards nationwide he's an egregious one in Massachusetts, a rotten state." [Dkt. 9-5].  On April 9, just the day after the Betar Worldwide tweet, the State Department issued a memo stating that Petitioner had been submitted by DHS/ICE for review on March 31, 2025 and revoking his visa, effective immediately.  [Dkt. 9-4].  The memo itself identifies Petitioner's protected conduct as a basis for the revocation, namely his "activities" and "rhetoric."

Third, Petitioner's detention is contrary to the Government's own policy initiatives.  As discussed in depth at the hearings before the Court, there are a myriad of options to pursue removal absent initial detention.  This is particularly true for someone like Petitioner, who was identified as neither a flight risk nor a danger to the community in his criminal case and remained on bond for more than a year and a half.  Meanwhile, the Trump administration is actively offering a free plane ticket and $1,000.00 to any immigrant willing to self-deport.  Press

22

Release, Dep't of Homeland Sec., DHS Announces Historic Travel Assistance and Stipend for Voluntary Self-Deportation (May 5, 2025).  Respondent Noem claimed that self-deportation is the safest option, both for the individual and for law enforcement, and argued that self-deportation eliminates a great deal of waste of taxpayer funds.[7]  Id.  Petitioner purchased his own plane ticket to return to Turkey and is not asking for a stipend, but instead of allowing the "safest option for our law enforcement" and a "70% savings for US taxpayers," Respondents demand detention.  It rises to the level of near absurdity that Respondents are working to deport many people quickly and at minimal expense to the American taxpayer, but absent an improper purpose, intend to extend Petitioner's detention.  While the Court must offer due deference to ICE's enforcement prerogative, it is not a leap that it is Petitioner's protected conduct (political viewpoint) that keeps Respondents so thoroughly intent on his detention.  Instead, the Court is simply following the breadcrumbs left by the Government itself.

Taken together, all these circumstances underscore Petitioner's protected conduct as the substantial or motivating factor for ICE's pursuit of his detention.

Finally, at oral argument, Respondents discussed Reno to argue that such a retaliatory claim is unavailable to Petitioner.  In Reno, the Supreme Court confronted a somewhat analogous case.  There, six temporary residents and two lawful permanent residents brought a First Amendment claim seeking to enjoin their deportation proceedings.  See generally Reno, 525 U.S. 471.  The Court explained that "an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation."  Id. at 488.  The Court went on to say, "in all cases, deportation is necessary in order to bring to an end *an ongoing violation* of United States law.  The contention that a violation must be allowed to continue

---

[7] For reference, imprisonment of one person in a Bureau of Prisons facility is $142.00 per day, $4,309.00 per month, and $51,711.00 per year.

because it has been improperly selected is not powerfully appealing . . . . When an alien's continuing presence in this country is in violation of the immigration laws, the Government does not offend the Constitution by deporting him for the additional reason that it believes him to be a member of an organization that supports terrorist activity." Id. at 491-92 (emphasis in original). The Supreme Court's reliance on the petitioners' ongoing violation makes Reno inapposite to the case at hand. As acknowledged by all parties, there is no other ground for Petitioner's removal beyond his actions at the protest. In fact, Petitioner remained in lawful immigration status until his SEVIS was terminated at 2:07 P.M. on May 7.[8] There was no "ongoing" violation of United States law until after he had been detained.

Instead, Petitioner is more similarly position to the petitioner in Ragbir, in which Ragbir, a former legal permanent resident, alleged retaliation for protected speech. 923 F.3d 53. There the Second Circuit found that "[b]ecause Ragbir's speech concerns 'political change,' it is also 'core political speech' and thus 'trenches upon an area in which the importance of First Amendment protections *is at its zenith*.'" (emphasis in original) Id. at 70. The court went on to say that "[a] plausible, clear inference is drawn that Ragbir's public expression of his criticism . . . played a significant role in the recent attempts to remove him . . . . To allow this retaliatory conduct to proceed would broadly chill protected speech, among not only activists subject to final orders of deportation but also those citizens and other residents who would fear retaliation against others." Id. at 71. In the same way the Second Circuit found it appropriate to consider the selective deportation claim in these circumstances, this Court finds it appropriate to consider Petitioner's detention-as-retaliation claim.

---

[8] Petitioner questioned whether the proper procedures were followed in terminating his SEVIS, but that is not presently before the Court.

In light of the above, the Court finds that Petitioner has a high likelihood of success on the merits of his First Amendment claim.

### 3.  Fifth Amendment

Petitioner also alleges a Fifth Amendment due process violation, claiming his detention lacks legitimate justification.  Indeed, the state court previously determined that Petitioner was neither a flight risk nor a danger to the community, setting bail at $250.00 and allowing him to remain free under conditions of release.  He has not only complied with all conditions imposed on him, but has also traveled outside of the country twice while on pre-trial release.  Thus, his current detention appears punitive rather than administrative, raising significant due process concerns.  It so follows that Petitioner has demonstrated a likelihood of success on his Fifth Amendment claim.

The Due Process Clause of the Fifth Amendment provides that "[n]o person . . . [shall be] deprived of life, liberty, or property, without due process of law."  U.S. Const. amend. V.  "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects."  Zadvydas v. Davis, 533 U.S. 678, 690 (2001).  Further, "the Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent" and substantive due process claims are available in the context of immigration detention.  Id. at 693-94 (citing Wong Wing v. U.S., 163 U.S. 228).

Petitioner claims that his immigration detention violates the Due Process Clause because it is motivated by an improper purpose.  While the Supreme Court has held that "[d]etention during deportation proceedings [i]s a constitutionally valid aspect of the deportation process . . . [and] the Due Process Clause does not require [the government] to employ the least burdensome

means to accomplish its goal," the ability to detain a noncitizen is not unlimited.  <u>Demore</u>, 538

U.S. at 523, 528.  Specifically, civil detention cannot be punitive.  <u>Fong Yue Ting v. United</u>

<u>States</u>, 149 U.S. 698, 730 (1893); <u>see also</u> <u>Zadvydas</u>, 533 U.S. at 690. "Rather than punishment,

immigration detention must be motivated by the two valid regulatory goals that the government

has previously argued motivate the statute: 'ensuring the appearance of aliens at future

immigration proceedings and preventing danger to the community.'" <u>Ozturk</u>, 2025 WL

1145250, at *20 (quoting <u>Zadvydas</u>, 533 U.S. at 690).

Petitioner is likely to succeed on the merits of his due process claim because the pursuit

of detention here is punitive.  In addition to the First Amendment retaliation claim discussed

above, at the motion hearing held before this Court, Respondents' counsel stated in no uncertain

terms that ICE is seeking detention because "actions have consequences."  Immigration

detention cannot be a punitive "consequence" for actions addressed in the state criminal court.

Even the arrest warrant for Petitioner, only produced by Respondents the day after the May 5

hearing before this Court, reinforces the idea that Petitioner's arrest is punitive.  [Dkt. 21-1].  The

arrest warrant, issued April 10, 2025, is based upon "the execution of a charging document to

initiate removal proceedings against the subject." <u>Id.</u>  Yet, the charging document, also known

as an NTA, which was provided by Respondents on May 7 at the third hearing before this Court,

was not completed until April 25—nine days after ICE agents attempted to detain the Petitioner.

The NTA also includes a certificate of service where an agent signs to confirm service.

According to the NTA provided, an agent signed to affirm it had been served upon the Petitioner

in person on the same day as its creation, April 25.  This cannot be true.  In brief, not only was

there no charging document when Respondents attempted to detain Petitioner on April 16, agents

then misrepresented the date of service, which is no earlier than May 7.

Respondents have done nothing to disabuse the Court of the most obvious conclusion: prolonging the Petitioner's detention was intended to be punitive. Thus, Petitioner is likely to succeed on his Fifth Amendment claim. Respondents have claimed nothing but ICE's discretion as a talisman of protection. In the name of discretion, Respondents ask the Court to close its eyes to reality. The guarantees of the Constitution allow no such thing.

### 4. Sixth Amendment

While Petitioner also raises a claim on Sixth Amendment grounds, the Court declines to assess the claim here, as the criminal matter on which the claim was based has concluded.

### B. Irreparable Harm

Petitioner has and will continue to suffer irreparable harm absent court intervention. Petitioner was arrested and detained as retaliation, depriving him of his liberty as a consequence for other constitutionally protected conduct. The right to be free from government detention is one of the most basic guarantees of our democracy. His confinement inflicts immense stress and fear, which on its own, constitutes irreparable harm. See Melendres v. Arpaio, 695 F.3d 990, 1002 (9th Cir. 2012) (recognizing that the fear of being subject to unlawful detention may itself constitute irreparable harm). Further, Petitioner's fear of detention is particularly acute as Respondents negotiate with foreign governments to place those in immigration custody in detention facilities in countries such as Libya, Rwanda, Saudi Arabia and El Salvador. The plan to send detained immigrants to Libya has been reported widely despite a report from the State Department stating that "[p]risons and detention facilities were often overcrowded, and conditions were harsh and life threatening." U.S. Dep't of State, Libya 2023 Human Rights Report 9 (2023) ("[D]etainees were denied adequate access to water, food, toilets, sanitation, light, exercise, medical care, legal counsel, and communication with family members. Poor and

unsafe infrastructure was common and exacerbated sanitation problems, which contributed to the spread of communicable diseases."); see also Eric Schmitt, Hamed Aleaziz, Maggie Haberman & Michael Crowley, Trump Administration Plans to Send Migrants to Libya on a Military Flight, N.Y. Times (May 6, 2025).

Conversely, Respondents will not suffer irreparable harm if injunctive relief is granted. Respondents remain free to pursue formal removal proceedings.  By contrast, every day Petitioner is detained because of his political views constitutes a significant injury.  Elrod v. Burns, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable harm.").

As a result, the irreparable harm to Petitioner, and lack of harm to Respondents, supports the issuance of a preliminary injunction.

**C.  Balancing of Equities and Public Interest**

Finally, the Court must balance the parties' relative hardships and consider the public interest.  These factors merge because the Respondents oppose the preliminary injunction.  Nken, 556 U.S. at 435.

Petitioner's detention raises serious First and Fifth Amendment concerns.  Beyond the obvious hardship that comes with Petitioner suffering an unconstitutional harm, which grows with every moment spent in custody, there is "substantial public interest 'in having governmental agencies abide by the federal laws.'"  League of Women Voters of U.S. v. Newby, 838 F.3d 1, 12 (D.C. Cir. 2016) (quoting Washington v. Reno, 35 F.3d 1093, 1103 (6th Cir. 1994)).  Unlawfully restricting protected speech or interfering with due process rights is squarely against public interest.

Conversely, there seems to be little to counterbalance the other side of the ledger.  As discussed, Petitioner intended to leave the United States following the conclusion of his criminal matter.  That would both address any concerns Respondents have for the public safety, despite a criminal court finding that Petitioner did not pose a risk of danger, and would seemingly support the Respondents' policy initiatives.  As Respondent Noem stated, "self-deportation is the best, safest and most cost-effective way to leave the United States."  Press Release, Dep't Homeland Sec., DHS Announces Historic Travel Assistance and Stipend for Voluntary Self-Deportation (May 5, 2025).

In sum, granting the preliminary injunction would serve the Petitioner and the public by protecting against continuing constitutional violations.  Further, it would help to serve the Respondents' policy interests in quickly removing Petitioner at the lowest expense to the American taxpayer.  As a result, the balance of the parties' relative hardships strongly weighs in favor of issuing the injunction.


V.     **CONCLUSION**

"The court is invested with the largest power to control and direct the form of judgment to be entered in cases brought up before it on habeas corpus."  In re Bonner, 151 U.S. 242, 261 (1894).  If detention is found unlawful, the court has power to delay discharge until steps to correct the defects are taken.  See Mahler v. Eby, 264 U.S. 32, 46 (1924) (citing cases).  Indeed, the fundamental purpose of habeas corpus is to allow individuals in custody to challenge the legality of their detention, with its traditional function being "to secure release from" unlawful confinement.  Gicharu v. Moniz, No. 23-CV-11672-MJJ, 2023 WL 5833115, at *1 (D. Mass. Sept. 8, 2023) (quoting Preiser v. Rodriguez, 411 U.S. 475, 484 (1973)).

Elections have consequences.  Actions have consequences.  These are two true statements.  Congress granted ICE broad authority and discretion to discharge its lawful duties and generally stripped district courts from judicial review.  However, district courts do not lose authority to address constitutional violations.  This is especially important since, in the end, constitutional issues cannot be reviewed by an immigration court.  When an agency procrastinates and prolongs detention to mete out punishment, as demonstrated here, it is an unlawful use of its authority.

Having considered the Petition, Amended Motion, supporting memorandum, exhibits, and applicable legal principles, and in light of the severe consequences for Petitioner and broader public interest in ensuring governmental adherence to Constitutional principles, the Court finds that Petitioner has met the necessary criteria for injunctive relief and **ORDERS** as follows:

1. Petitioner's Amended Motion is **GRANTED**;

2. Respondents are **ORDERED** to release Petitioner from custody immediately;

3. Respondents—along with their officers, agents, servants, employees, attorneys, successors, assigns, and all persons acting in concert or participation with them—are **ENJOINED** from arresting, detaining, or otherwise restricting Petitioner's liberty in any manner until further order of this Court for any reason related to the issues litigated herein;

4. Should Respondents seek to detain Petitioner on any basis other than that addressed in the Petition [Dkt. 9], they are **ORDERED** to provide sufficient advance notice to the Court and Petitioner's counsel, allowing Petitioner an opportunity to be heard on whether such asserted basis for detention constitutes a pretext for retaliation;

5.   Respondents are **ORDERED** to return Petitioner's personal property to him;

6.   No security bond is required under Federal Rule of Civil Procedure 65(c);

7.   This Order shall remain in effect until further order of this Court; and

8.   Respondents' request for a stay pending appeal is **DENIED**.

   **SO ORDERED.**

Dated: May 8, 2025                                    /s/ Angel Kelley
                                                        Hon. Angel Kelley
                                                        United States District Judge